# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY YOUNG,
                    Plaintiff,

    v.

SCHOOL DISTRICT OF
PHILADELPHIA,
                    Defendant.

CIVIL ACTION

No. 06-4485

Pollak, J.                                                    September 24, 2009

## OPINION

Plaintiff Barry Young, an African-American former Building Engineer with the

School District of Philadelphia ("the district"), has sued the district for various actions it

took before, during, and after his employment with defendant.  Because plaintiff is

proceeding *pro se*, the court construes Young's complaint liberally and holds it "to 'less

stringent standards than formal pleadings drafted by lawyers.'" *Estelle v. Gamble*, 429

U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)).  Therefore,

the court will interpret plaintiff's complaint as alleging unlawful discrimination based on

race in violation of both Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2003(e) *et*

*seq.*, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 *et seq*. ("PHRA").

Since the PHRA is interpreted and applied identically to Title VII, this court's disposition

1

of the Title VII claims will govern the PHRA claims. *E.g.*, *Ward v. Ridley Sch. Dist.*, 940 F. Supp. 810, 811 n.2 (E.D. Pa. 1996). In addition to discrimination, harassment, retaliation, and unfair hiring claims under Title VII and the PHRA, the complaint alleges breach of the drug and alcohol policy included in the collective bargaining agreement ("CBA") between the district and Local 1201, Firemen & Oilers Union ("Local 1201" or "the union") as well as state-law claims for defamation, forgery, and breach of a resignation agreement.

This court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a). The case is now before this court on the School District's motion for summary judgment (docket no. 50), plaintiff's motion to amend his complaint to add a wrongful termination claim (docket no. 55), and plaintiff's motion for a speedy trial (docket no. 54). For the reasons given below, the court will grant defendant's motion in part and deny it in part, deny plaintiff's motion to amend, and deny plaintiff's motion for a speedy trial.

## I.

Plaintiff's various claims implicate the history of his employment with the district. The court therefore reviews that history at some length, viewing the facts in the light most favorable to plaintiff, the non-moving party. *See Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 218 (3d Cir. 2009).

## A.

2

Plaintiff began work with the district as a Building Engineer Trainee on December 9, 2002.  Def.'s Ex. C, at 24.[1]  In September 2004, plaintiff passed an examination for his engineer's license, which he received in January 2005; around this time, he was promoted to the position of Building Engineer I.  *Id.* at 26-27, 274.  As a building engineer, plaintiff's position was considered to be "safety-sensitive"; he was thus subject to random drug testing and testing for reasonable suspicion.  *Id.* at 29.  Throughout his employment, plaintiff was a member of Local 1201.  The relationship between the union and the district is governed by a CBA, which includes a Policy on Substance Abuse by Members of Local 1201 National Conference of Firemen and Oilers ("PSA").  *See* Def.'s Ex. D.

Plaintiff's employment with the school district began inauspiciously.  Two weeks after being hired, plaintiff was accused of stealing items from a classroom.  *See* Def.'s Ex. G.  A hearing was held on January 23, 2003, to determine whether or not he should be discharged for that or other alleged disciplinary infractions. Def.'s Ex. H.  Although Young's supervisor, Timothy McCollum, recommended that plaintiff be discharged, Def.'s Ex. G, at 2, Young was not fired.  Def.'s Ex. H, at 3.

Plaintiff suffers from depression, an ailment that has caused him to "self-medicate" with alcohol, cocaine, and crack.  Def.'s Ex. C, at 38.  Hoping that treatment for depression would obviate the need to self-medicate, plaintiff called the district on January

---

[1]     Throughout this opinion, citations to Defendant's Exhibits A, C, and E are to the relevant pagination of the deposition transcripts.  Numeric citations to Defendant's Exhibit D are to pages of the CBA between the district and the union; all other citations to that exhibit are to the applicable Bates numbers.  Citations to all other exhibits in this case are by page number, with page 1 representing the page immediately following the covering page of the exhibit.

8, 2004 to ask the health administration for assistance with a substance abuse problem; the district referred him to Ron Ellis, a union representative. *Id.*  Ellis arranged for Young to attend a rehabilitation program in Florida known as Renaissance Recovery. *Id.* at 37.  Plaintiff attended the rehabilitation center, which diagnosed him with depression and cocaine and alcohol dependence, from January 10, 2004 until his discharge on February 13, 2004. *See* Def.'s Ex. D, at P0136, P0142.  Following his discharge, plaintiff was in intensive outpatient treatment at the Livengrin Foundation, a substance abuse center in Pennsylvania, for slightly more than a month; he then participated in their "general outpatient" program until June 8, 2004. *Id.* at P0152.

On March 16, 2004, Young reported to Carol Kenney, Director of Employee Health Services for the school district, for a medical examination.  Def.'s Ex. E, at 69. According to Kenney, plaintiff sought help for a substance abuse problem at that appointment, *id.*, and plaintiff recalls telling a district employee that he had been in rehabilitation to address drug and alcohol addictions, Def.'s Ex. C, at 87.  Plaintiff signed an "Employee Notice of Self-Referral" on March 16 and received a "Referral for Rehabilitation" from the district.  Def.'s Ex. D, at P0045, P0154.

On March 26, 2004, plaintiff tested negative for drugs in a return-to-duty test. *Id.* at SDP-00443.  He returned to work on April 5, and tested negative in a follow-up test on May 5.  Def.'s Ex. C, at 122-23; Pl.'s Resp. at 7.  On June 22, 2004, even though Young was not using cocaine or crack, he contacted Ellis, stating that he was drinking and depressed, *id.* at 54-55, and "begg[ing]" Ellis to send him to rehabilitation, either with a

psychiatrist or in an after-work program, *id.* at 102.  Instead, at Ellis's insistence, he returned to the Florida rehabilitation center.  *Id.* at 54-55.

Plaintiff's second stint in Florida lasted from June 22, 2004 until July 23, 2004. Def.'s Ex. D, at P0139.  Young was again diagnosed with alcohol and cocaine dependence, *see id.*, and once again attended Livengrin and other programs following his discharge, *id.* at P0152; Def.'s Ex. E, at 65.  Plaintiff reported back to work on February 17, 2005, with a memorandum detailing his attendance at a program called Rehab After Work, Def.'s Ex. E, at 67, and was referred to Greg Mattison, a substance abuse professional, Pl.'s Resp. at 7.  On June 2, Mattison cleared Young to return to work, which plaintiff did on June 14, after passing another return-to-duty drug test.  *Id.*

Following his return to duty, plaintiff was subject to follow-up drug tests[2]; one of these tests, taken on October 17, 2005, was positive for cocaine.  Def.'s Ex. D, at SDP-00390.  On October 21, plaintiff was called to Kenney's office, where he was informed of the positive test results and was given a memorandum explaining that a termination hearing was scheduled for October 25, 2005.  Def.'s Ex. C, at 163, 171-72.  Plaintiff and Ron Ellis, who was also present, requested that plaintiff have a split-sample test.[3]  *Id.* at

---

[2]     The district's records show that Young's only drug tests between June 2004 and October 2005 occurred on June 9, 2005 and July 12, 2005.  Pl.'s Mem. at 7.  Plaintiff's EEOC complaint states that he passed "approximately four" drug tests between July 2004 and October 2005.  Def.'s Ex. B, at 1.

[3]     The parties have not clearly defined the term "split-sample test."  While the precise meaning of the term is not material to the outcome of this case, the court assumes that it refers to Section 9.4 of the PSA, which mandates that of the 45 milliliters of urine contained in a "single use collection container," "[t]he primary test specimen shall contain at least 30 ml. of urine," and "[a]t least 15 ml. shall be used for the split sample

173.  That test was never completed.  Pl.'s Mem. at 8.  Kenney told plaintiff that he

would be fired because he failed a drug test while on probation.  Def.'s Ex. C, at 173.

On October 25, 2005, while plaintiff was en route to his termination hearing, Ellis

told him that he would be fired if he did not resign and "coerced" plaintiff to sign a

resignation letter.  *Id.* at 175.  That letter specifies that "[b]ecause of the agreement

reached allowing [plaintiff] to resign, [he] will be entitled to all termination benefits, and

any other monies due [him] under the contract."  Def.'s Ex. D, at SDP-00391.

### B.

Several facts outside of this main narrative are also relevant to plaintiff's claims.

In 1993 or 1994, long before being hired as a Building Engineer, plaintiff briefly served

as a probationary custodial worker for the district.  Def.'s Ex. A, at 303-04.  During

plaintiff's probationary period, the district retained half of his salary; because Young was

discharged while still on probation, he never received that portion of his pay.  *Id*.

After joining the district as a Building Engineer Trainee in 2002, Young was

supervised for a time by George Graf.  Plaintiff testified at his deposition that on one

occasion, Graf requested that Young clean a boiler, and while plaintiff was performing

this task, the cleaning equipment malfunctioned.  Pl.'s Dep. at 204.[4]  Plaintiff avers that

---

specimen."  Def.'s Ex. D, at 134.  The court therefore understands plaintiff's request to be
a request that the 15 milliliter secondary specimen be tested.

[4]    Portions of plaintiff's deposition that are relevant to this case have not been
provided to the court by either party.  At least some of these excerpts have, however, been
filed in *Young v. Local 1201 Firemen & Oilers Union*, No. 07-cv-3576, with which this
case was consolidated for discovery purposes.  The court therefore takes judicial notice of
the fact that plaintiff made certain statements during his deposition that are not in the

Graf then gave a false report of the incident to the district.  *See id*.  As a Trainee, plaintiff also attended classes run by Timothy McCollum.  When McCollum arrived for one such those class, he yelled at one of Young's classmates and then aggressively approached and questioned Young.  Def.'s Ex. C, at 214-15.  Plaintiff further testified that during another class, McCollum, who is white, asked Young and another African-American employee to stop discussing religion. Pl.'s Dep. at 218.

At plaintiff's deposition, he testified that he requested a week of vacation in October 2003, but later decided to remain at work for that week.  Pl.'s Dep. at 211. According to plaintiff, he submitted a form to McCollum to revoke his vacation request, but – because the initial vacation request form said that all changes had to be confirmed by McCollum, and because plaintiff never received any such confirmation – he took a vacation day on Monday of the week in question.  *Id.*  On Tuesday, he called the district and was told that he was due to be at work and that his absence on Monday was marked unexcused in his personnel records.  *Id.*

The district also coded plaintiff's absences from work on January 8 and 9, 2004 – the day he first sought assistance from the health administration and the following day – as unexcused.  Def.'s Ex. C, at 60; Def.'s Ex. D, at SDP-00406.  The district's policy is that all absences that are unreported by a certain time are marked as unexcused.  Def.'s Ex. C, at 61.  Plaintiff did telephone the district on January 8 to report his absence, but it is undisputed that he placed this call after the cut-off time.  Def.'s Ex. C, at 61; Def.'s Ex.

---

record of this case.  *See* Fed. R. Evid. 201.

D, at SDP-00503.  On January 9, plaintiff did not call in, because Ron Ellis had stated

that Ellis would "take care of everything"; Young understood Ellis to mean that he would

call the school and report Young's absence.  Def.'s Ex. C, at 68-69.  Ellis was

subsequently asked to contact the district on Young's behalf to rectify this issue, but he

failed to do so.  *Id.* at 76-77.  Young later complained to the union about the way

McCollum, Young's supervisor at the time, handled Young's unexcused absences.

Plaintiff did not, however, tell the union that he believed McCollum was harassing him

because of his race.  *Id.* at 226.

 Finally, after plaintiff's resignation in October 2005, the school district continued

to pay his salary for one month.  Upon noticing this error, the district sent a notice of

overpayment requesting remittance of the amounts paid minus the value of certain

amounts of accrued leave time. Def.'s Ex. F, at 1.  Plaintiff's final pay stub from the time

he was actually employed lists greater amounts of vacation time than the overpayment

notice.  *Id.* at 3.

## II.

Summary judgment should be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists where

the jury could reasonably find for the non-moving party, *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986), and a dispute over facts is material where it could affect the

outcome of the case, *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).  "In considering the evidence, the court should draw all reasonable inferences against the moving party."  *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

A party seeking summary judgment carries the initial burden of informing the district court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact.  *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639.  Where the non-moving party bears the burden of proof, the moving party must show that the non-moving party cannot support its case with the evidence in the record.  *Celotex*, 477 U.S. at 325.  In rebuttal, the non-moving party must then identify facts that create a genuine issue of dispute for trial.  Fed. R. Civ. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.

The court will address plaintiff's claims in turn, beginning with the discrimination, harassment, retaliation, and unfair hiring claims arising under Title VII and the PHRA before considering the state-law defamation and forgery claims, the allegations of a CBA breach, and the question of whether the district breach a resignation agreement with the plaintiff.

## A.

The burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs plaintiff's racial discrimination claim.[5]  Under that framework, the plaintiff "bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence."  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam).  To do so, plaintiff must show that he was (1) a member of a protected class, (2) qualified for his position, and (3) subject to an adverse employment action taken (4) under circumstances giving rise to an inference of unlawful discrimination.  *See, e.g.*, *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-12 (3d Cir. 1999).  To survive a summary judgment motion, the plaintiff's evidence must be "sufficient to convince a reasonable fact finder to find all of the elements of the prima facie case."  *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (applying *McDonnell Douglas* in the context of the Age Discrimination in Employment Act).  This is a "low bar," and a "'prima facie case is easily made out.'"  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (quoting *Ezold v. Wolf, Block, Schor & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1993)).

If the plaintiff establishes a prima facie case, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the [adverse employment action].'"  *Sarullo*, 352 F.3d at 797 (quoting *McDonnell Douglas*, 411 U.S. at 802).

---

[5]     As discussed below, plaintiff attempts to raise an inference of discrimination from the treatment of other district employees.  He has not put forth any direct evidence showing that the district discriminated against him.

When the employer proffers such a reason, "[t]he plaintiff must then establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination." *Id.* To do so, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The crux of plaintiff's discrimination claim is that while the school district applied the alcohol and drug policy in the CBA to similarly situated white employees, he was forced to resign in violation of the policy following his failed drug test in October 2005. *See* Pl.'s Resp. at 1-3. Defendant argues that plaintiff has not presented sufficient evidence to make out a *prima facie* case of discrimination. Def.'s Mem. at 17. Plaintiff is a member of a protected class, and the court assumes that the second and third elements of the *prima facie* case are met, as the crux of the parties' dispute is over the presence or absence of an inference of discrimination.

Such an inference may be created in a "myriad of ways." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990). For instance, discrimination may be inferred "if the employer's actions remain unexplained" and "it is more likely than not that such actions were based on impermissible reasons," *id.*, so long as there is "some causal nexus between [plaintiff's] membership in a protected class" and the adverse employment action, *Sarullo*, 352 F.3d at 798. In particular, the inference may be raised by evidence

11

that employees outside the protected group have been "treated more favorably." *Josey v.*

*John R. Hollingsworth Corp.*, 996 F.3d 632, 638 (3d Cir. 1993).

The parties have presented the drug testing histories of three white district

employees, referred to in the record as Employees A, B, and C.  Employee A was a

building engineer who resigned on February 23, 2005.  Def.'s Ex. F, at 16.  On June 6,

2003, Employee A underwent a random drug test, which was negative; he subsequently

signed a notice of self-referral for alcohol or drug dependency after being directed to take

a reasonable suspicion drug test.  *Id.* at 17-19.  Employee A never returned to work,

Def.'s Mem. at 19, and resigned after being called to a hearing to discuss unauthorized

absences, Def's. Ex. F, at 20.  Employee B, meanwhile, tested positive in a random drug

test in 1995 and later returned to work after spending some weeks in rehabilitation.  *Id.* at

22, 25-26.  Employee B – who remains employed with the district – was tested for drugs

and alcohol four times after returning to work; three of these tests were unannounced, and

all four were negative.  *Id.* at 22; Def.'s Mem. at 20.  Finally, Employee C submitted two

notices of self-referral and then tested positive for marijuana use.  Def.'s Ex. F, at 44-46.

After this test, he resigned.  *Id.* at 43.

At first glance, defendant's treatment of these employees seems highly congruous

with its treatment of the plaintiff.  Like Employee A, plaintiff was allowed to self-refer,

and like Employee B, plaintiff was subject to random tests after returning from

rehabilitation.  Finally, like Employee C, plaintiff resigned instead proceeding to a

termination hearing after two apparent self-referrals and a positive drug test.  Two

potential differences in treatment nonetheless lurk in the details:  Employee B did not receive a return-to-work test and was tested far less frequently following that return than plaintiff, *see* Pl.'s Resp. at 7, 11; Def.'s Ex. F, at 22, and Employee C signed two notices of self-referral, whereas plaintiff signed only one.[6]

The court assumes without deciding that these differences are sufficient to fulfill the final prong of a *prima facie* case of discrimination under Title VII, because plaintiff's evidence does not suffice to overcome the district's invocation of plaintiff's violation of the Policy on Substance Abuse as a race-neutral reason for his termination.  Def.'s Mem. at 18.  With regard to the potential difference with Employee C, although plaintiff did not sign two self-referral forms, the PSA defines "self-referral" as an "employee's voluntarily identifying himself or herself (including through his or her Union representative) as requiring assistance in dealing with alcohol or drug dependency."  Def.'s Ex. D, at 124. It is undisputed that plaintiff signed one self-referral form, and that he approached Ron Ellis a second time.  On that second occasion, plaintiff was not using crack or cocaine and, while drinking, was not doing so uncontrollably.  Def.'s Ex. C, at 54-55.  However, plaintiff states that "he begged Ron Ellis to send [him] to rehab" – just not to the inpatient facility in Florida.  *Id.* at 102.  Plaintiff's request that a union representative send him to rehabilitation falls squarely within the definition of a self-referral even though plaintiff's

---

[6]        Assuming without deciding that the plaintiff's absences were treated differently than those of Employee B, *see* Def.'s Ex. F, at 25, that difference cannot ground plaintiff's claim, because it appears to be unrelated to the reasons for plaintiff's resignation.  Further, while plaintiff's October 2005 request for a split-sample drug test was not fulfilled, there is no evidence in the record that other employees were treated differently.

primary objective was to receive treatment for depression; under the definition in the policy, then, both the plaintiff and Employee C self-referred twice.[7]  That both subsequently resigned instead of facing termination hearings after a further positive drug test bespeaks perfect consistency of treatment.[8]

The other provisions of the PSA relied on by plaintiff do not alter the conclusion that he, like Employee C, self-referred twice.  The PSA specifies that a voluntary identification is only effective as a self-referral if "the employees [*sic*] or his representative submits a completed self-referral form to the [relevant] Administrator . . . before the School District receives a report of the employee's positive test result."  Def.'s Ex. D, at 124.  This clause, however, does not mean that a voluntary identification absent the requisite form is not a self-referral.  Rather, the provision's plain meaning is that, if an employee fails to complete a self-referral form before a drug test is returned as positive, then that incident will be viewed as a positive test and not as a self-referral.  Moreover, while plaintiff correctly notes that "[a]n employee's voluntary recourse to assistance for a substance abuse problem shall not in itself be considered . . . a self-referral," *id.* at 125, that language must be read in light of the definition of a self-referral.  The two provisions

---

[7]     The district lists February 17, 2005, the date plaintiff reported back to the district after a second stint in rehabilitation, as his second self-referral date.  It is not at all clear that plaintiff's goal on that day was to "identify[] himself . . . as requiring assistance." Def.'s Ex. D, at 124.  That was, however, plaintiff's clear intent when he approached Ron Ellis.

[8]     Kenney's statement that Young would be fired because he was on probation is unsupported by the language of the PSA, but her statement betrays no discriminatory animus.

14

are entirely complementary:  If an employee seeks out help from the district or the union,

he has self-referred – but if the employee seeks help through other channels, he has not

self-referred.  Plaintiff accordingly self-referred within the meaning of the term in the

policy.[9]

The fact that Employee B was tested less frequently than plaintiff is similarly

insufficient to overcome the district's race-neutral justification for plaintiff's discharge.

As noted above, to survive summary judgment, plaintiff must present evidence either to

show that (1) the district's proffered race-neutral reason is a pretext or (2) discrimination

was "more likely than not a motivating or determinative cause of the employer's action."

*Fuentes*, 32 F.3d at 764.  To demonstrate that defendant's race-neutral reason was

pretextual, plaintiff must put forth "'weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that

a reasonable factfinder could rationally find them unworthy of credence' and hence infer

that the proffered nondiscriminatory reason 'did not actually motivate' the employer's

action."  *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Fuentes*, 32

F.3d at 764-65).  This is too much weight for Employee B's testing history to bear.

Employee C – who also self-referred twice – took eight drug tests in the seven months

between the time he returned to work and the time of his resignation.  Employee C, in

---

[9]     The court further notes that the PSA nowhere expressly states that self-referrals standing alone are "violations" of the policy.  This fact, however, cannot help plaintiff, because the district's identical treatment of Employee C indicates that the district consistently treats self-referrals as violations.

15

other words, took *more* drug tests per month on average than the plaintiff.[10]  In light of this fact, the difference in testing frequency between plaintiff and Employee B does not give rise to an inference that the district fired Young for a reason other than his failed drug test.

Evidence that "the employer has treated more favorably similarly situated persons not within the protected class" may be used to fulfill the second *Fuentes* prong, *Simpson*, 142 F.3d at 645 (3d Cir. 1998), but Employee B's testing history does not fulfill that purpose either.  Employee C, who was tested more frequently than plaintiff, is by far the best comparator in the record.  Accordingly, plaintiff cannot show that his treatment by the district was more likely than not to result from discrimination, and the court will grant summary judgment for the defendant on plaintiff's discrimination claim.

## B.

In order to establish a *prima facie* case of harassment under Title VII, "a plaintiff must establish, 'by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee.'"  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)) (emphasis omitted).  "Specifically, a plaintiff must show: (1) that he or she suffered intentional

---

[10]     This statement is true if one accepts either the district's view that plaintiff was tested only twice after June 2004 and before October 2005 or plaintiff's view that he passed four drug tests between July 2004 and October 2005.  Indeed, even if plaintiff had been tested four times between June 2005 and September 2005 and then again on October 17, 2005, Employee C's schedule would remain slightly more rigorous.

discrimination because of race; (2) the discrimination was pervasive [or] regular; (3) the

discrimination detrimentally affected the plaintiff; (4) the discrimination would

detrimentally affect a reasonable person of the same race in that position; and (5) the

existence of respondeat superior liability." *Aman*, 85 F.3d at 1081.[11]  To satisfy the first

element, plaintiff need not show "overt racial harassment"; rather, "[a]ll that is required is

a showing that race is a substantial factor in the harassment, and that if the plaintiff had

been white [he] would not have been treated in the same manner."  *Id.* at 1081, 1083.

Under the third and fourth elements, meanwhile, a work environment is actionable under

Title VII if it is both "an environment that a reasonable person would find hostile or

abusive" and one that the "victim . . . subjectively perceive[s] . . . to be abusive."  *Harris*

*v. Forklift Sys.*, 510 U.S. 17, 21 (1993).

Plaintiff alleges that he endured seven incidents of racial harassment.  Four of the

episodes involve Timothy McCollum, plaintiff's supervisor from the date of plaintiff's

hiring in December 2002 until "very short[ly]" after plaintiff's six-month probationary

period ended.  Def.'s Ex. C, at 221.  First, McCollum recommended plaintiff's dismissal

in a memorandum dated January 3, 2003.  Def.'s Ex. G, at 2.  Second, according to

plaintiff's deposition testimony, before plaintiff started one of his classes for Building

Engineer Trainees, McCollum "came into the classroom . . ., cursed [one of plaintiff's]

classmate[s] out, . . . looked directly at [plaintiff], walked completely around the whole

---

[11]     *Aman* uses the phrase "pervasive and regular" in the second element.
Subsequently, the Third Circuit adopted the phrase "pervasive or regular."  *See Jensen v.*
*Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006), *overruled in part on other grounds by*
*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

classroom and got directly in [plaintiff's] face." Pl.'s Dep., at 214-15.   McCollum then

asked plaintiff "what the fuck are you looking at?  You find something funny?"  *Id.* at

215.  During another of these classes, McCollum "adamant[ly]" requested that plaintiff

and another African-American employee cease discussing religion in the classroom.

*Id.* at 218.

Third, plaintiff testified at his deposition that McCollum wrongfully coded

plaintiff's absence on a day in October 2003 as unexcused.  Plaintiff had originally

requested a week's vacation but subsequently decided to remain at work, *see id.* at 211,

and he submitted paperwork to that effect to McCollum.  Plaintiff testified, however, that

the initial vacation form said that "any adjustments had to be confirmed by Mr.

McCollum," *id.*, and because he received no such confirmation, he took a vacation day on

the Monday of the week in question.  On Tuesday, plaintiff telephoned the district and

was told that, because he filled out a form saying that he would be at work, he was not on

vacation.  McCollum apparently refused to alter the determination that plaintiff's Monday

absence was unexcused.  *See id.*  Finally, plaintiff alleges that McCollum harassed him by

coding his absences on January 8 and 9, 2004 – at which time plaintiff was at a

rehabilitation center in Florida – as unexcused.  Plaintiff called in after the cut-off time

for excusal on January 8, *id.* at 61, and asked Ron Ellis to report his Tuesday absence to

the district, *id.* at 74-77.

Plaintiff's treatment by McCollum is insufficient to establish a *prima facie* case of

racial harassment.  McCollum's recommendation that plaintiff be terminated was based

on reports of theft and insubordination made by Michael Clark, plaintiff's supervisor at Fitzsimons Middle School, Sch. Dist. Ex. G, and the recommendation was contingent on the allegations being "established" at a hearing, *id.* at 2.  Further, nothing in McCollum's letter, Clark's reports, plaintiff's responses thereto, or the minutes of the subsequent conference between McCollum, plaintiff, and a union representative reveals that race played any role in McCollum's recommendation, *see* Def.'s Exs. G & H, and plaintiff was not terminated as a result, Def.'s Ex. H, at 3.

Similarly, although McCollum's classroom behavior was boorish, the court cannot conclude that it was racially motivated.  The classmate at whom McCollum yelled was apparently not black (plaintiff describes him as perhaps "Greek"), McCollum's subsequent anger at plaintiff made no reference to plaintiff's race, Pl.'s Dep. at 216, and plaintiff testified that he never heard white Trainee classmates speak about religion in McCollum's presence, *id.* at 220.

As for plaintiff's October 2003 absence, assuming that the facts are as plaintiff describes, plaintiff and McCollum had a clear disagreement, but there is again no evidence to suggest that McCollum treated either Young or other African-American employees less favorably than white employees with regard to the vacation policy.  By contrast, plaintiff *did* testify that McCollum treated employees differently when enforcing the absence reporting policy.  *See* Pl.'s Dep. at 220-21.  As plaintiff put it, "there were [c]aucasian workers that were called – that would call in the morning and have a vacation for that very same day, and there were African Americans that weren't treated the same

19

way." *Id.*  Assuming that this allegation is true, however, the district's refusal to grant

Young an excused absence on January 8, 2004 does not, standing alone, constitute

"pervasive or regular" discrimination.  *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir.

2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53 (2006).

The remaining three incidents relied on by plaintiff do not involve McCollum.

First, plaintiff alleges that George Graf, a building engineer who supervised plaintiff

during his training period, sent him into a boiler with equipment that "malfunction[ed]"

and caused a fire, did not respond to plaintiff's "repeated[]" calls for assistance, and

subsequently "made a false report" regarding "safety issues."  Pl.'s Dep. at 204.  Second,

plaintiff believes that the district's failure to pay him for the leave time reflected on his

pay statement at the time he resigned constitutes harassment.  Finally, plaintiff argues that

the district harassed him by forcing him to undergo drug tests upon his post-rehabilitation

return to work.

The record is devoid of evidence, however, tending to indicate that either the

boiler incident or the lack of vacation pay was racially motivated.  Plaintiff's drug tests,

meanwhile, were mandated by the PSA, *see* Def.'s Ex. D, at 129, and as discussed in the

context of plaintiff's discrimination claim, Young was tested less often than white

Employee C, who had also self-referred twice.  None of these incidents, in other words,

constitutes "intentional discrimination because of race," which is the first ingredient of a

successful harassment claim.

In short, there is virtually nothing to suggest that plaintiff's treatment by defendant was racially motivated.  The only suggestion of discrimination arises from plaintiff's belief that white employees were granted excused absences even when they called in late, while plaintiff was not granted the same treatment.  Without more, however, the district's decision to code plaintiff's January 8, 2004 absence as unexcused does not constitute "pervasive or regular discrimination."  Indeed, even if all of the incidents plaintiff described were racially motivated, they collectively would not add up to a working environment "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive enough to alter the conditions of [his] employment and create an abusive working environment."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  For these reasons, the court will grant summary judgment to the defendant on plaintiff's harassment claim.[12]

### C.

"In order to establish a prima facie case of discriminatory retaliation under Title VII, [an employee] must show (1) that [he] engaged in protected activity, (2) that the employer took adverse action against [him], and (3) that a causal link exists between the protected activity and the employer's adverse action."  *Kachmar v. Sungard Data Sys*., 109 F.3d 173, 177 (3d Cir. Pa. 1997).  Summary judgment for the employer is proper if

---

[12]     Plaintiff's harassment-related allegations would also not suffice to survive summary judgment if made in support of a discrimination claim.  Again, plaintiff presents potentially colorable evidence of racial discrimination only with regard to his January 8, 2004 unexcused absence, and that absence is not causally connected to plaintiff's resignation.

the plaintiff cannot "raise a genuine issue of material fact as to . . . one or more elements of the plaintiff's prima facie case." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997).

Plaintiff did not engage in any protected activity.  "'Opposition' to discrimination" is a protected activity, even if it "take[s] the form of 'informal protests of discriminatory employment practices, including making complaints to management.'" *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).  Such protests must, however, "'explicitly or implicitly' allege[] that a protected characteristic was the basis for the adverse employment action.  A general complaint of unfair treatment is insufficient to establish protected activity under Title VII." *Curay-Cramer*, 450 F.3d at 135 (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)).

Plaintiff's retaliation claim arises from complaints plaintiff made to Ron Ellis at the union concerning his "harassment" at the hands of McCollum.  Def.'s Ex. C, at 76, 226.  Plaintiff admits, however, that he "never complained to the union about [McCollum] harassing [plaintiff] because of [plaintiff's] race." *Id.* at 226.  Rather, plaintiff simply spoke to Ellis about plaintiff's belief that McCollum was improperly coding plaintiff's absences as unexcused.  *See id.*  Plaintiff's conversations with Ellis about McCollum thus do not "allege[] that a protected characteristic was the basis for the adverse employment action," *Curay-Cramer*, 450 F.3d at 135, and defendants are entitled to summary judgment on the retaliation claim.

22

**D.**

Plaintiff's unfair hiring practice claim stems from his treatment by the district in 1993 or 1994, when he was a probationary custodial worker. Def.'s Ex. A, at 303-04. The district retained half of Young's salary because of his probationary status, and when plaintiff was "terminated prior to passing probation," he never received the retained salary. *Id.* at 303. Plaintiff believes that this practice is imposed disproportionately on minorities and only in certain departments within the school district. *Id.*

The court construes this claim as one for unfair hiring practices in violation of Title VII. *See, e.g.*, *Ercole v. U.S. Dep't of Transp.*, No. 07-cv-2049, 2008 WL77858, at *4-*5 (E.D.N.Y. Sept. 10, 2008) (considering an unfair hiring practices claim under Title VII); *Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for the Univ. of La. Sys.*, No. 06-1571, 2007 WL 2703162, at *2 (W.D. La. Sept. 17, 2007) (same). As this court noted in ruling on the district's motion to dismiss, "in most cases, a Title VII suit is precluded if the plaintiff has not exhausted his or her administrative remedies," and "'[t]he relevant test in determining whether [Young] was required to exhaust h[is] administrative remedies . . . is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.'" *Young v. Sch. Dist. of Phila.*, No. 06-4485, 2007 WL 2319767, at *2 (quoting *Antol v. Perry*, 92 F.3d 1291, 1296 (3d Cir. 1996)).

Plaintiff's EEOC charge, filed in 2006, relates solely to the sequence of events preceding his 2005 resignation from school district employment, not events surrounding a

hiring and probationary period in the 1990s.  *See* Def.'s Ex. B.  Further, plaintiff testified

at his deposition that he had not filed a "charge[] of discrimination with any agency"

based on these events.  Def.'s Ex. C, at 304.  Accordingly, the court finds that plaintiff

did not exhaust his administrative remedies before pursuing an unfair hiring claim, and

summary judgment will be granted to the defendant on that claim.

## E.

Defamation claims against the district are precluded by the immunity granted to

local governments and their agencies in 42 Pa. Cons. Stat. § 8541.  Pursuant to that state

statute, local government agencies such as school districts are immune from liability in

almost all cases.  There are eight exceptions to this rule, *see* 42 Pa. Cons. Stat. § 8542(b),

but defamation actions do not fall within the scope of any of the exceptions.[13]  *See Keeler*

*v. Everett Area Sch. Dist.*, 533 A.2d 836, 837 (Pa. Commw. Ct. 1987) (affirming the trial

court's decision that a school district was immune from a defamation claim after the

plaintiff conceded the issue).  The court will thus grant defendant's motion on the

defamation count.

## F.

Plaintiff's forgery count rested on his belief that someone had forged his signature

on the March 16, 2004 self-referral form.  At his deposition, plaintiff testified that when

"shown the original" of that document, he "was convinced that" he "did sign it."  Def.'s

---

[13]    The exceptions concern the operation of motor vehicles; "[t]he care, custody or control of personal property," real property, and animals; "[t]rees, traffic controls, and street lighting"; utility facilities; streets; and sidewalks.  42 Pa. Cons. Stat. § 8542(b).

Ex. C, at 244.  For this reason, summary judgment will be granted to defendant on the forgery claim.

**G.**

Plaintiff's penultimate claim is for a "policy violation." Compl. at 1.  The complaint alleges that the school district forced plaintiff to take drug tests, *see id.*, and plaintiff elaborated at his deposition that "had the policy been followed to the letter, then I would still have been employed by the School District of Philadelphia."  Pl.'s Dep. at 223.  In his opposition to defendant's motion, plaintiff further states that the district violated policy by failing to refer him to a "substance abuse professional" after he sought assistance for his drug problems.  Pl.'s Resp., at 1.  On the basis of these statements, the court construes plaintiff's "policy violation" claim as alleging that the school district violated the PSA included in the CBA by (1) failing to refer him to a substance abuse professional, (2) categorizing him as a dual self-referral, (3) forcing him to take drug tests after his self-referrals, and (4) treating his failed drug test as a third violation warranting termination.

"Under federal labor law" – which governs when terms of a CBA are at issue – "aggrieved employees must exhaust their CBA's grievance and arbitration procedures before filing a complaint in federal court 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.'" *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1536-37 (3d Cir. 1992) (quoting *United Steelworkers of Am. v. Warrior &*

*Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).  Here, the CBA contains an extensive

grievance-and-arbitration procedure applicable to almost all "complaint[s] . . . that there

has been as to any employee a violation . . . of any of the provisions of [the CBA]."

Def.'s Ex. D, at 6.  The only exceptions are for (1) "matter[s] as to which the [School

Reform Commission ("SRC")] or [Chief Executive Officer of the School District

("CEO")] is without authority to act" and (2) "any rule or regulation . . . not in violation

of" the CBA mandates a different "method of review."  *Id.*  Because the CBA itself places

"the suspension or dismissal of employees" including Building Engineers into the

purview of the SRC and CEO, *id.* at 2, 102, plaintiff's claim appears likely to be subject

to the grievance procedures in the CBA.

    Nevertheless, because it is not clear that the CBA required plaintiff to pursue the

grievance and arbitration procedure in these circumstances, and because the record is

resolutely silent on the question of whether or not plaintiff availed himself of that

procedure, the court will deny summary judgment on this claim at this time.[14]

## H.

    The court construes plaintiff's final claim, which alleges breach of a resignation

agreement, as a state-law action for breach of contract.  This claim arises from plaintiff's

resignation letter, which specifies that "[b]ecause of the agreement allowing [plaintiff] to

resign, [he] will be entitled to all termination benefits, and any other monies due [him]

---

[14]     Although the district's motion is styled as one for summary judgment on all
of plaintiff's claims, defendant's moving papers do not to address plaintiff's allegations
of CBA violations.

26

under the contract." Def.'s Ex. D, at SDP 00391.  Specifically, plaintiff alleges that the district failed to pay him for all of his accrued vacation and other leave days.  Def.'s Ex. C, at 294.

Defendant's motion does not directly address this claim, but in connection with its response to plaintiff's harassment allegations, the district does argue that "plaintiff is simply incorrect that he is owed any monies" because the district paid him an extra month's salary.  Def.'s Mem. at 22.  The court cannot, however, grant summary judgment to the defendant on this ground.  According to the overpayment form sent to plaintiff by defendant, the district overpaid Young by $2,731.48 between October 25 and November 25, 2005.  Def.'s Ex. F, at 1.  Plaintiff's pay stub for the period ending October 28, 2005, meanwhile, lists three days of accrued but unused personal leave days, 16.17 remaining vacation days, and thirteen personal illness days.  *Id.* at 3.  The overpayment form states that personal leave is paid out at $129.15 per day, with personal illness and vacation days paid at $118.76 per day, so assuming that plaintiff was owed those rates for all of the days listed on the October 28 pay stub, he would be due $3,851.68 for unused leave time.  This sum, of course, is *more* than the overpayment made by the district, and although the overpayment form indicates that plaintiff had significantly less accrued vacation time remaining than indicated on the pay stub, nothing in the record suggests how to reconcile the two documents.   Accordingly, defendant has not demonstrated that it is entitled to summary judgment on this claim.

**IV.**

27

On August 12, 2009, plaintiff filed a motion to amend his complaint to add a claim for wrongful termination.  *See* Docket No. 55.  Plaintiff previously made the same motion before Magistrate Judge M. Faith Angell, who correctly concluded that "[t]o the extent that Plaintiff wishes to argue that he was terminated because of Defendants' alleged improper conduct in relation to the employee substance abuse policy . . . such an argument is [already] within the scope of this litigation."  Docket No. 43, at 1.  The same is true of any allegation that defendant's treatment of Young under the PSA amounted to a breach of the CBA.  Further, to the extent that plaintiff wishes to plead that the district tortiously discharged him in violation of Pennsylvania law, that claim is precluded by the immunity conferred on local agencies by 42 Pa. Cons. Stat. § 8541.  *See Kuzel v. Krause*, 658 A.2d 856 (Pa. Commw. Ct. 1995).  Accordingly, plaintiff's motion to amend will be denied as futile.

## V.

Because both the speedy trial provisions of the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, apply only to criminal prosecutions, not to civil actions, plaintiff's motion for a speedy trial will be denied.

## VI.

For the foregoing reasons, defendant's motion for summary judgment will be granted as to plaintiff's claims of racial discrimination, harassment, retaliation, unfair hiring practices, defamation, and forgery; defendant's motion will be denied as to plaintiff's CBA violation and breach of contract claims; and plaintiff's motions to amend

28

the complaint and to receive a speedy trial will be denied.  An appropriate order

accompanies this opinion.